# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# LAFAYETTE-OPELOUSAS DIVISION

| | | |
|---|---|---|
| **KIMBERLY E. RYDER** | * | **CIVIL ACTION NO. 05-0918** |
| **VERSUS** | * | **JUDGE MELANÇON** |
| **COMMISSIONER OF SOCIAL SECURITY** | * | **MAGISTRATE JUDGE HILL** |

## REPORT AND RECOMMENDATION

This social security appeal was referred to me for review, Report and Recommendation pursuant to this Court's Standing Order of July 8, 1993. Kimberly E. Ryder, born March 26, 1966, filed an application for supplemental security income on October 22, 2002, alleging disability as of August 14, 2002, due to lupus, Hepatitis C, depression, and anxiety.

## FINDINGS AND CONCLUSIONS

After a review of the entire administrative record and the briefs filed by the parties, and pursuant to 42 U.S.C. § 405(g), I find that there is substantial evidence in the record to support the Commissioner's decision of non-disability and that the Commissioner's decision comports with all relevant legal standards. *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

In fulfillment of F.R.Civ.P. 52, I find that the Commissioner's findings and conclusions are supported by substantial evidence, which can be outlined as follows:

**(1) Consultative Examination by Dr. Sandra Durdin dated August 28, 2001**. Claimant complained of lupus, Hepatitis C and bad nerves. (Tr. 94). She also indicated that she felt nervous, did not sleep well, and had anxiety attacks. She reported that she got along with others, but sometimes just preferred to be alone.

On mental status examination, claimant spoke in clear, goal-directed speech. Her mood was depressed, but her affect was appropriate. She was alert and fully oriented without evidence of psychosis. She denied suicidal and homicidal ideation, as well as substance abuse.

Claimant reported that she was not taking any antidepressant medication because she had tried Celexa and had a poor reaction to it. (Tr. 95). She was taking Xanax for nervousness. She complained of crying spells, worries, and of having the shakes sometimes, especially in her hands. She spent her time watching television, resting, caring for her baby, and doing simple household chores as she could.

Dr. Durdin observed that claimant had a long history of moderate depression, exposure to abuse and violence, and repeated poor choices in relationships. She noted that at that time, claimant was moderately to severely depressed without psychosis. She estimated that claimant had high borderline to low average

2

intelligence with probable elementary level academics. She stated that claimant had contact with family and friends, and was not isolated.

Dr. Durdin's diagnostic impression was major depression, recurrent, without psychosis with concomitant anxiety; estimated high borderline to low average intelligence with probable functional illiteracy; lupus and Hepatitis C, by history, and a history of childhood abuse and exposure to domestic violence, as well as being a victim of domestic violence in adult relationships. She stated that claimant was competent to manage her own funds. (Tr. 96). She opined that claimant was limited to simple labor jobs, which she might have a hard time doing due to combined physical and emotional symptoms. Dr. Durdin noted that claimant should be under the care of a mental health professional for treatment of depression and anxiety.

**(2) Report from Dr. Kevin Fox dated December 6, 2002**. Dr. Fox stated that he had treated claimant since October, 2000. (Tr. 105). He noted that she had a history compatible with Hepatitis C. (Tr. 106). On February 25, 2002, she complained of aches and pains, and showed him bottles of medications she had been taking, including Medrol, Tylenol with Codeine, Soma, Lortab, Halcion, and Xanax. She told him that she needed a letter for the Food Stamp office stating that she could not work because the medications made her drowsy, uncoordinated, and unable to work.

On August 28, 2002, claimant complained of aching all over and ulcers. Dr. Fox recommended that she go to University Medical Center ("UMC") rheumatology clinic for her lupus condition, as it could cause rare complications, such as strokes, if not monitored. He noted that she seemed to be primarily seeking prescription medication for her pain.

On September 20, 2002, claimant came in for a Head Start physical, as well as for complaints of depression. She stated that she had had suicidal thoughts and had made attempts in the distant past. She reported that she would stay in her room a lot and cry. She was prescribed Paxil.

On October 11, 2002, Dr. Fox changed claimant's medication to Effexor because Paxil was not helping. He recommended that she present for a follow-up visit.

**(3) Consultative Examination by Dr. W. J. Briley dated January 28, 2003**. Claimant reported having lupus erythematosis with symptoms of pain in the shoulders, hips, hands, fingers, fever at times, and a butterfly-type rash across the bridge of her nose to the cheek. (Tr. 112). She was taking Hydrocodone for pain from lupus. She was also diagnosed with Hepatitis C in 1999, and had stomach problems. Additionally, she had depression with frequent crying, anhedonia, poor sleep, and paranoia. Her medications included Soma, Xanax, HDC.APAP, Vitaplex,

4

Zantac, Celexa, Halcion, and Claritin D. (Tr. 113).

On examination, claimant had normal gait and station, and got on and off of the exam table with no problems. (Tr. 114). She had a rash on the bridge of her nose extending to both cheeks, and a red throat. She complained of pain in the back and hip. She had no tenderness or spasm, and sensation and reflexes were normal. She had decreased range of motion by 25 to 35 %. She had no redness or swelling of the joints, and good dexterity.

Dr. Briley's diagnosis was a history of lupus with a butterfly distribution rash over the nose and cheeks, a history of Hepatitis C, and depression and anxiety for which she was taking Effexor and Alprazolam. (Tr. 114-15).

**(4) Residual Functional Capacity ("RFC") Assessment dated March 18, 2003**. The medical consultant determined that claimant could lift 50 pounds occasionally and 25 pounds frequently; stand/walk or sit about 6 hours in an 8-hour workday, and had unlimited push/pull ability. (Tr. 117). She could occasionally climb, and frequently balance, stoop, kneel, crouch, and crawl. (Tr. 118). The examiner determined that claimant's limitations were mainly due to anxiety/depression, and not functional limitations. (Tr. 121).

**(5) Consultative Examination by Dr. Alan Taylor dated February 20, 2003**. Claimant reported that she had ongoing difficulties regarding depression and anxiety.

(Tr. 125). She cried often, but had no current suicidal or homicidal ideation. She had no history of mental health services, and was prescribed medication by her general practitioner.

On evaluation, claimant was observed to "sigh heavily" when presented with a task. She also was observed to roll her eyes. She demonstrated disinterest in testing and poor interpersonal skills. Dr. Taylor believed that the test results reflected "an underestimate of her functioning."

Administration of the WAIS-III revealed a verbal IQ of 70, performance IQ of 75, and full scale IQ of 70, which placed her overall intellectual performance in the borderline range. Dr. Taylor estimated that claimant's intellectual functioning fell at the high end of the borderline range to low average range. (Tr. 127). From a psychological standpoint, she appeared to be capable of maintaining employment, provided that she was placed in little contact with the public.

Dr. Taylor's impression was adjustment disorder with mixed anxiety and depressed mood, lupus and Hepatitis C. (Tr. 127-28). Claimant's Global Assessment of Functioning score was 65. (Tr. 128).

**(6) RFC Assessment– Mental and Psychiatric Review Technique ("PRT") dated March 10, 2003**. In the RFC assessment, Dr. R. H. Rolston determined that claimant was moderately limited as to her ability to understand, remember, and carry

out detailed instructions; sustain an ordinary routine without special supervision; interact appropriately with the general public, and set realistic goals or make plans independently of others. (Tr. 130-31). In the PRT, Dr. Ralston found that claimant was moderately limited as to restriction of activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace. (Tr. 144-45).

**(7) Records from Dr. Arlene C. Richard dated October 24, 2002 to May 13, 2004**. Dr. Richard treated claimant for complaints of nerves, insomnia, anxiety and depression, sinusitis, stomach problems, lupus, and back pain. (Tr. 157-62). She noted that claimant's anxiety and depression were controlled with medications. (Tr. 162).

**(8) Records from UMC dated December 1, 1998 to July 26, 2004**. On December 8, 2003, claimant was admitted for gastritis with hemorrhage. (Tr. 192). Dr. Perry Stokes performed an esophagogastroduodenoscopy with biopsy and colonoscopy, which revealed a hiatal hernia, a low esophageal ring, erosive duodenitis, chronic appearing antritis, and internal hemorrhoids. (Tr. 193). She was prescribed Prilosec over-the-counter. (Tr. 194).

On April 23, 2004, claimant was seen for follow-up. (Tr. 186). She reported that she drank 12 beers per week. The impression was chronic Hepatitis C. She was

7

instructed to stop alcohol and continue Prevacid.

On June 26, 2004, claimant complained of pain in all of her joints. (Tr. 179-80). She stated that she drank beer daily. (Tr. 181). The assessment was chronic pain and alcohol abuse. She was instructed to avoid narcotics and hepatotoxics.

**(9) Records from Dr. Arlene Richard dated July 13, 2004 to October 19, 2004**. During this period, Dr. Richard treated claimant for complaints of headaches, back pain, sinusitis, angina, ear pain, hernia, and epigastric distress. (Tr. 263, 265, 267). An ECG was normal. (Tr. 266). The impression was insomnia, anxiety/stress, lupus, and back pain. (Tr. 263, 265, 267).

**(10) Claimant's Administrative Hearing Testimony**. At the hearing on July 22, 2004, claimant was unrepresented. (Tr. 275-76). She was 38 years old. (Tr. 271). She had a seventh-grade education in special education classes. (Tr. 272). She stopped attending school when she was about 16 years old.

Claimant had past work experience as a driver, waitress, food preparer, and cleaner. (Tr. 272-73). She testified that she had stopped working because of depression and lupus. (Tr. 274). She also said that she did not like being around a lot of people. (Tr. 281). Her medications included Xanax, Hydrocodone, sleep medication, stomach medication, and a blood thinner. (Tr. 279).

As to activities, claimant testified that she attended church occasionally. (Tr. 283). She stated that she sat on the swing and watched her children, ages 5 and 13, play in the sprinkler.

**(11) Administrative Hearing Testimony of Craig Matte**. Mr. Matte testified that he checked on claimant every day. (Tr. 281). He stated that she was always complaining about pain in her back and joints, and became nauseated a lot. (Tr. 281-82). He also said that she had mood swings. (Tr. 282).

Mr. Matte stated that claimant did not get out a whole lot because she became weak and red in the face if she got too much sun. (Tr. 283). He reported that she used to fish, but could hardly get out on the sun anymore.

**(12) Administrative Hearing Testimony of Ilida Rolls Dupont**. Ms. Dupont testified that she helped claimant with her children a lot. (Tr. 285). She also helped claimant pay her bills, because claimant did not read very well. Additionally, she reported that she did claimant's grocery shopping for her, because claimant had anxiety attacks when she was around a lot of people. (Tr. 286).

**(13) Administrative Hearing Testimony of George Hearn, Vocational Expert ("VE")**. Mr. Hearn described claimant's past work as a waitress and food preparer as unskilled and light. (Tr. 290). When the ALJ asked Mr. Hearn to identify work of a light or sedentary nature which involved less contact with the public, the

9

VE listed the job of housekeeper, including a motel maid, of which there were approximately one and a half million motel maid jobs and about three and a half million domestic jobs available. (Tr. 291-92). Another one was light assembler, of which there were about one million jobs available. (Tr 291).

**(14) The ALJ's findings are entitled to deference**. Claimant argues that the ALJ erred in failing to find her disabled pursuant to Sections 12.04C and/or 12.05C of the listings or, alternatively, in assessing her residual functional capacity, resulting in an erroneous determination that she could perform other work in the national economy.

As to the first argument, claimant asserts that the ALJ erred in failing to find her disabled pursuant to Section 12.05C of the listings, which provides as follows:

> 12.05 Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> ***
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05C.

Claimant argues that she meets the first part of this listing because Dr. Taylor found that she had a verbal and full scale IQ score of 70, which demonstrates that she has "significantly subaverage general intellectual functioning." (rec. doc. 8, p. 3). However, although Dr. Taylor obtained an IQ score of 70, he opined that these results reflected "an underestimate of her functioning" due to her disinterest in testing and questionable effort. (Tr. 125, 127). He observed that claimant "sigh[ed] heavily" when presented with a task, and "roll[ed] her eyes" during the mental status examination. (Tr. 127). While her intellectual functioning was found to fall in the borderline range, Dr. Taylor estimated that her intellectual functioning actually fell "at the high end of the borderline range to low average range." (Tr. 127). This finding is further buttressed by Dr. Durdin, who assessed claimant with "high borderline to low average intelligence." (Tr. 95). Thus, the opinions of these experts do not support claimant's assertion that she meets the IQ requirement for this listing.

Additionally, claimant argues that she was prejudiced by the ALJ's failure to obtain her school records because they "might have" changed the outcome of her claim had they been provided to Dr. Taylor for his evaluation. (rec. doc. 8 p. 4). However, Dr. Taylor specifically mentioned claimant's seventh-grade education, special education courses, and retention in the third and seventh grades in his report.

11

(Tr. 124). The fact that claimant did poorly in school did not seem to affect Dr. Taylor's opinion, since he found that she was disinterested and had questionable effort on testing. (Tr. 127).

To establish prejudice, claimant must show that counsel "could and would have adduced evidence that might have altered the result." *Brock v. Chater*, 84 F.3d 726, 728 (5th Cir. 1996). *Kane v. Heckler*, 731 F.2d 1216, 1219 (5th Cir. 1984). Claimant points to no evidence that would have been adduced and that could have changed the result. Thus, this argument lacks merit.

Further, claimant has not shown that she meets the second part of § 12.05C, which requires "a physical or other mental impairment imposing an *additional and significant* work-related limitation of function." (emphasis added). While claimant asserts that she suffers from "severe" systemic lupus erythematosus and Hepatitis C which cause her "extreme" pain and fatigue, there is no objective medical evidence showing that these conditions result in significant work-related limitations of function. (rec. doc. 8, p. 3). In fact, Dr. Briley found that the only problems resulting from claimant's lupus was a butterfly-type rash. (Tr. 114). Additionally, there are no records indicating that she had end organ damage or any other limitations from Hepatitis. Thus, claimant cannot establish that she meets the second part of the listing at § 12.05C.

Next, claimant asserts that the ALJ erred in failing to find that she was disabled pursuant to § 12.04C, which provides as follows:

> 12.04 Affective Disorders: Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.
> The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.
>
> ***
>
> C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
>
> 1. Repeated episodes of decompensation, each of extended duration; or
>
> 2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
>
> 3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04C.

Claimant asserts that she has been treated with medication for depression and anxiety for many years. (rec. doc. 8, p. 5). While claimant indicated symptoms of anxiety and depression, Dr. Taylor noted that she had never sought counseling or

13

mental health services for these symptoms. (Tr. 127). Additionally, claimant reported to Dr. Taylor that the medications helped to alleviate her symptoms to some degree. This is further supported by the records of claimant's treating physician, Dr. Richard, who indicated that claimant's anxiety and depression were controlled with medications. (Tr. 162). If an impairment reasonably can be remedied or controlled by medication, treatment or therapy, it cannot serve as a basis for a finding of disability. *Johnson v. Bowen*, 864 F.2d 340, 348 (5th Cir. 1988); *Lovelace v. Bowen*, 813 F.2d 55, 59 (5th Cir. 1987).

Additionally, claimant contends that the witnesses at the hearing indicated that she requires a highly supportive living environment, because someone has to read her mail, pay her bills, clean and shop for her, and help take care of her son. (Tr. 281-83, 285-86, 293). However, the Social Security regulations contemplate such setting as a hospital, halfway house, board and care facility, or other environment that provides similar structure. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00F. In any event, claimant reported to Dr. Durdin that she could drive, manage money, keep up her household, and take care of her child. (Tr. 94-95). In fact, both Dr. Durdin and Dr. Taylor opined that she was capable of working. (Tr. 96, 127). Thus, this argument lacks merit.

For a claimant to show that her impairment matches a listing, it must meet *all* of the specified medical criteria. (emphasis in original). *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S.Ct. 885, 891, 107 L.Ed.2d 967 (1990). An impairment that manifests only some of those criteria, no matter how severely, does not qualify. *Id.* As claimant has not demonstrated that she met all of the criteria under §§ 12.04 or 12.05, the ALJ's finding that claimant's impairments did not meet these listings is entitled to deference.

Alternatively, claimant argues that the ALJ erred in assessing her residual functional capacity. (rec. doc. 8, p. 5). The ALJ found that claimant had the RFC "to perform medium unskilled work that requires the claimant to work more with things than people." (Tr. 17). Claimant asserts that this finding is erroneous in light of her pain and limitations from "severe" systemic lupus erythematosus and Hepatitis C. (rec. doc. 8, p. 6). However, Dr. Briley found no problems from claimant's lupus, other than a rash over her nose and cheeks. (Tr. 114). Additionally, there are no records indicating that she had limitations from Hepatitis C. Thus, this argument lacks merit.

Claimant further argues that the ALJ failed to consider the side effects from her medications. (rec. doc. 8, p. 6). The record reflects that the ALJ did question claimant at the hearing regarding her medications. (Tr. 278-80). However, claimant

did not report any side effects at the hearing or in her disability report. (Tr. 60, 278-80). The decision also shows that the ALJ reviewed all of the evidence in light of the requirements of 20 C.F.R. § 416.929, which includes consideration of the side effects of medication. (Tr. 16). Thus, this argument lacks merit.

Finally, claimant asserts that the ALJ failed to include her moderate limitation in concentration, persistence, and pace in his questions to the vocational expert. (rec. doc. 8, p. 6). In the decision, the ALJ found that claimant had a moderate limitation in social function and in concentration, persistence, and pace. (Tr. 16). Although the ALJ did not specifically include the limitation as to concentration, persistence and pace in his questioning to the vocational expert, he did incorporate the limitation in social function when he asked Mr. Hearne whether he could identify jobs not requiring frequent contact with the public. (Tr. 291). Additionally, claimant's limitations as to concentration, persistence and pace were taken into account by the limitation to unskilled work, which was specifically mentioned in the questions the ALJ presented to the vocational expert. (Tr. 291). Further, the ALJ applied Social Security Ruling 85-15 to this case, which provides the framework for evaluating solely non-exertional impairments. SSR 85-15, 1995 WL 56857 (Tr. 18).

In any event, the medical records support the finding that claimant had the residual functional capacity to work, even with her mental limitations. Dr. Durdin

16

determined that claimant was limited to simple labor jobs, which the ALJ recognized in his questions to the vocational expert. (Tr. 96, 291). Additionally, Dr. Taylor found that claimant was capable of maintaining employment, provided that she was placed in little contact with the public, which limitation the ALJ also incorporated into his questions to Mr. Hearne. (Tr. 127, 291). Therefore, the undersigned finds that the ALJ's questions to the vocational expert reasonably incorporated all disabilities of the claimant recognized by the ALJ. *Boyd v. Apfel*, 239 F.3d 698, 707 (5th Cir. 2001); *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994). Accordingly, this argument lacks merit.

Based on the foregoing, it is my recommendation that the Commissioner's decision be **AFFIRMED** and that this action be **DISMISSED** with prejudice.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and F.R.Civ.Proc. 72(b), parties aggrieved by this recommendation have ten (10) business days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within ten (10) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FACTUAL FINDINGS AND/OR THE PROPOSED LEGAL CONCLUSIONS**

17

**REFLECTED IN THIS REPORT AND RECOMMENDATION WITHIN TEN (10) DAYS FOLLOWING THE DATE OF ITS SERVICE, OR WITHIN THE TIME FRAME AUTHORIZED BY FED.R.CIV.P. 6(b), SHALL BAR AN AGGRIEVED PARTY FROM ATTACKING THE FACTUAL FINDINGS OR THE LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT, EXCEPT UPON GROUNDS OF PLAIN ERROR.  *DOUGLASS V. UNITED SERVICES AUTOMOBILE ASSOCIATION*, 79 F.3D 1415 (5TH CIR. 1996).**

Signed this 3rd day of March, 2006, at Lafayette, Louisiana.

*[signature]*
C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE

# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# LAFAYETTE-OPELOUSAS DIVISION

| | | |
|---|---|---|
| DONNA F. LANDRY | * | CIVIL ACTION NO. 04-1386 |
| VERSUS | * | JUDGE HAIK |
| COMMISSIONER OF SOCIAL SECURITY | * | MAGISTRATE JUDGE HILL |

## JUDGMENT

This matter was referred to United States Magistrate Judge C. Michael Hill for Report and Recommendation. After an independent review of the record, and noting the absence of any objections, this Court concludes that the Report and Recommendation of the Magistrate Judge is correct and adopts the findings and conclusions therein as its own.

Accordingly, IT IS ORDERED, ADJUDGED AND DECREED that the Commissioner's decision is AFFIRMED and this matter is DISMISSED with prejudice.

Lafayette, Louisiana, this ___ day of _____, 2005.

_____
RICHARD T. HAIK
UNITED STATES DISTRICT JUDGE

# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# LAFAYETTE-OPELOUSAS DIVISION

| | | |
|---|---|---|
| **DONNA F. LANDRY** | * | **CIVIL ACTION NO. 04-1386** |
| **VERSUS** | * | **JUDGE HAIK** |
| **COMMISSIONER OF SOCIAL SECURITY** | * | **MAGISTRATE JUDGE HILL** |

## JUDGMENT

This matter was referred to United States Magistrate Judge C. Michael Hill for Report and Recommendation. After an independent review of the record, including the objections filed herein, this Court concludes that the Report and Recommendation of the Magistrate Judge is correct and adopts the findings and conclusions therein as its own.

Accordingly, IT IS ORDERED, ADJUDGED AND DECREED that the Commissioner's decision is AFFIRMED and this matter is DISMISSED with prejudice.

Lafayette, Louisiana, this ___ day of _____, 2005.

_____
RICHARD T. HAIK
UNITED STATES DISTRICT JUDGE